United States District Court
Middle District of Florida
Jacksonville Division

**JESSE ANTHONY MONROE,**

  *Plaintiff,*

v.                                                              **NO. 3:23-cv-820-PDB**

**COMMISSIONER OF SOCIAL SECURITY,**

  *Defendant.*

---

## Order

This order decides Carol Avard's latest motion for approval to take an attorney's fee under 42 U.S.C. § 406(b) from her client's benefits, Doc. 31, and whether to impose sanctions against Avard for material factual misrepresentations made to the court in pursuit of that approval, *see* Doc. 28 (order to show cause).

### A.

Nearly all Social Security actions follow the same path: (1) the claimant files a complaint; (2) the Commissioner files the administrative record as his answer; (3) the claimant files a brief; (4) the Commissioner files a response brief or a motion to remand; (5) the claimant files a reply brief if warranted; (6) the court rules; (7) the case ends, or, if the claimant is successful before the court, the claimant files a motion for an attorney's fee under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412(d); and (8) the claimant's lawyer, if successful on remand, returns to the court to request approval of an attorney's

fee under § 406(b) from the past-due benefits awarded to the claimant. *See* Supp. R. for Soc. Sec. Actions Under 42 U.S.C. § 405(g).

## B.

Avard represents Social Security claimants before the agency and the courts. She has appeared in approximately 875 actions in the Middle District of Florida, including this one. Given the commonality of Social Security actions, she, like most, if not all, of the lawyers who typically represent Social Security claimants in this court, uses the same papers (for example, the same complaint, the same EAJA motion, and the same § 406(b) motion) and the same blocks of authority, changing only the client-specific details, such as the client's name, the period under consideration, the decision date, the type of benefits involved (disability insurance, supplemental security income, or both), and the application of the law to the facts.

## C.

This case did not follow the ordinary path. Instead, no brief was filed; the Commissioner simply filed the administrative record and moved to remand.[1] Doc. 16. As a result, Avard performed little to no substantive work

---

[1]The Administrative Law Judge (ALJ) found that the plaintiff has a residual functional capacity (RFC) that included limitations in the areas of lifting; sitting; standing; walking; climbing ladders and stairs; balancing; kneeling; stooping; crouching; crawling; reaching overhead; handling; fingering; interacting with supervisors, coworkers, and the public; depending on teams; requiring production rates (like assembly line work or work requiring hourly quotas); and requiring changes in routine work settings. Tr. 23. The vocational expert (VE) testified that the plaintiff could perform jobs such as a marker, a router, and a photocopy machine operator. Tr. 29.

At the agency level, Avard objected to the use of the Dictionary of Occupational Titles (DOT) as outdated. Tr. 17. The primary basis of the motion to remand, filed in September 2023, was to permit the agency to obtain vocational evidence to resolve any

for the plaintiff before this court. Her work consisted of a pre-lawsuit consultation and review of the file (with which she was familiar, having served as the plaintiff's counsel before the agency) and post-lawsuit reviews of docket entries comprising docket text, brief orders, and a few other rudimentary

---

apparent conflict between jobs the VE identified and the DOT, and to articulate the resolution of any apparent conflict. Doc. 16 at 1.

The law on apparent conflicts was "hot" at the time. *See* Social Security Ruling (SSR) 00-4p ("Use of Vocational Expert and Vocational Specialist Evidence, and Other Reliable Occupational Information in Disability Decisions") (rescinded and replaced by SSR 24-3p effective Jan. 6, 2025); *Viverette v. Comm'r of Soc. Sec.*, 13 F.4th 1309, 1315–16 (11th Cir. 2021) (holding that a VE's testimony regarding a person limited to simple, routine, and repetitive tasks conflicts with the DOT's description of a job requiring reasoning level 3); *Buckwalter v. Acting Comm'r of Soc. Sec.*, 5 F.4th 1315, 1323–24 (11th Cir. 2021) (holding that a VE's testimony regarding a person limited to following simple instructions does not apparently conflict with the DOT's description of jobs requiring reasoning level 2); *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1362 (11th Cir. 2018) (holding that SSR 00-4p imposes a duty on ALJs to identify and resolve apparent conflicts between DOT data and VE testimony, and this duty is not fulfilled simply by taking the VE at his word that his testimony comports with the DOT when the record reveals an apparent conflict between the VE's testimony and the DOT); *Zoslow v. Comm'r of Soc. Sec.*, 778 F. App'x 762, 765 (11th Cir. 2019) (holding that there is an apparent conflict); *Perez v. Comm'r of Soc. Sec.*, No. 24-10770, 2024 WL 5245256, at *4 (11th Cir. Dec. 30, 2024) (holding that a VE's testimony regarding a person who was limited to standing or walking for no more than four hours a day conflicts with the DOT's description of jobs requiring "walking or standing to a significant degree"); *Lowery v. Acting Comm'r, Soc. Sec. Admin.*, No. 22-13913, 2024 WL 890133, at *6 (11th Cir. Mar. 1, 2024) (holding that a VE's testimony regarding a person who would struggle with multi-step instructions conflicts with the DOT's description of a job requiring reasoning level 2); *Bacon v. Comm'r of Soc. Sec.*, 861 F. App'x 315, 319 (11th Cir. 2021) (holding that a VE's testimony regarding a person who is limited to "lower stress work environments, without fast-paced production quotas" does not conflict or apparently conflict with the DOT's description of jobs requiring "constant reaching, handling, and near acuity"); *Christmas v. Comm'r of Soc. Sec.*, 791 F. App'x 854, 857 (11th Cir. 2019) (holding that a VE's testimony regarding a person who cannot frequently communicate does not conflict or apparently conflict with the DOT's description of the job of fruit distributor because "the DOT does not discuss communication requirements for this role"); *Johnson v. Comm'r of Soc. Sec.*, 782 F. App'x 875, 876, 878 (11th Cir. 2019) (holding that a VE's testimony regarding a person limited to simple, routine tasks conflicts with the DOT's description of a job requiring reasoning level 3).

papers.[2] *See* Doc. 21-1 at 17–18. For the pre-lawsuit work, she recorded 2 hours. *See* Doc. 21-1 at 17. For the post-lawsuit work, she recorded the minimum billing increment each time (.1 hours; i.e., 6 minutes), which totaled .9 hours. The actual time spent was less if only a minute or two was spent reviewing a few lines of docket text (like the judge assignments, *see* Docs. 3, 18) or the papers.[3] Doc. 21-1 at 17–18.

Based on the 2.9 hours and the asserted time it took Avard to change her standard EAJA motion to reflect the current client's information and the hours worked, and an hourly rate of $244.27, the court awarded an EAJA attorney's fee of $1,270.20.[4] Docs. 22, 23.

---

[2]Avard claimed no work on the complaint, which bears her electronic signature and is based on the same form complaint she files in every Social Security case, including the allegation that the ALJ violated the plaintiff's Fifth Amendment right to Due Process by "failing to proceed with a full and fair hearing which prejudiced the Plaintiff," Doc. 1 ¶ V—an allegation that cannot possibly have a foundational basis in every Social Security action that Avard brings.

[3]The docket text for judicial assignments read in full, "NEW CASE ASSIGNED to Judge Timothy J. Corrigan and Magistrate Judge Patricia D. Barksdale. New case number: 3:23-cv-820-TJC-PDB. Motion(s) REFERRED: 2 MOTION to Proceed In Forma Pauperis . Motion(s) referred to Magistrate Judge Patricia D. Barksdale. (AM) (Entered: 07/14/2023)," Doc. 3; and "Case Reassigned to Magistrate Judge Patricia D. Barksdale. New case number: 3:23-cv-820-PDB. Judge Timothy J. Corrigan no longer assigned to the case. (MDC) (Entered: 09/18/2023)," Doc. 18.

[4]With the motion for an attorney's fee under the EAJA, Avard submitted a "Schedule of hours by Carol Avard" in which she stated that she had spent 2 hours before suing on work described as "Consultation, review file," and .1 hours each time she reviewed a notice or paper on the docket: the docket entry identifying the assigned district and magistrate judges, Doc. 3; *see* footnote 3, *supra*; a 1-paragraph order granting an application to proceed in forma pauperis, Doc. 10; a 2-paragraph notice of the substitution of one Assistant United States Attorney for another, Doc. 11; an AO 85 form ("Notice, Consent, and Reference of a Civil Action to a Magistrate Judge"), Doc. 15; the Commissioner's 1-paragraph motion and 1-paragraph memorandum of law requesting reversal and remand, Doc. 16; the AO 85 form, signed by the district judge, Doc. 17; the docket entry removing the district judge from the case assignment, Doc. 18; *see* footnote 3, *supra*; the 5-paragraph order granting the motion for reversal and remand, Doc. 19;

4

**D.**

On remand, the plaintiff received $137,444.00 in past-due benefits for the period from April 2020 to August 2025. Doc. 31 at 1; Doc. 31-1 at 3. For an attorney's fee for work during the agency proceedings, the agency approved the maximum allowed under 42 U.S.C. § 406(a); specifically, $9,200.00.[5] Doc. 31 at 3; *see* 42 U.S.C. § 406(a)(2)(A); 90 Fed. Reg. 19241, 19242 (May 6, 2025).

**E.**

Avard returned to this court and asked for approval to take $34,361.00 from the plaintiff's past-due benefits as an attorney's fee under § 406(b) for the work she performed before the court, with the acknowledgment that she would have to refund the plaintiff the $1,270.20 EAJA fee. Doc. 24 at 1–2. She based the request on a contingent-fee agreement between her and the plaintiff, in which the plaintiff agreed to pay all costs and that Avard may charge "25% of retroactive benefits" for the work she performed before the court, subject to court approval.[6] Doc. 24-2.

---

and the 1-paragraph judgment, Doc. 20. Doc. 21-1 at 17–18. In the same schedule, she stated that she spent .1 hours reviewing the "file" and "time sheets"; 2 hours to draft and review the EAJA motion and memorandum of law; and .2 hours to prepare an affidavit. Doc. 21-1 at 18.

[5]Avard began representing the plaintiff before the agency in July 2021, *see* Tr. 87–91, right after the agency determined at the initial level that the plaintiff was not disabled, *see* Tr. 61–71. A non-attorney with Avard's firm began representing the plaintiff before the agency in January 2023, Tr. 166, right after the administrative hearing was noticed, Tr. 147. The agency split the § 406(a) fee between the two. *See* Doc. 31-1 at 4.

[6]The plaintiff signed the agreement with Avard in July 2023, Doc. 24-2, during the period when the agency found he was disabled, Doc. 24-1 at 1. In the ALJ's decision, made a few months before the agreement, the ALJ found that the plaintiff had severe impairments that included posttraumatic stress disorder and general anxiety disorder and limitations in areas including understanding, remembering, or applying information,

To obtain approval to take $34,361.00 from her client's past-due benefits, which Avard contended was a reasonable fee for her 2.9 hours of work, Doc. 24 ¶ 2, Avard stated that "attorneys" spent 37.10 hours on the case, Doc. 24 at 17; *see* Doc. 24-3 (schedule of hours describing only Avard as the timekeeper). She stated that the attorneys spent that time on "many tasks, including reviewing the record to determine the viability of the appeal and participating in a successful decision from the U.S. District Court." Doc. 24 at 17; *see* Doc. 21-1 at 17–18 (timesheet submitted with the EAJA motion showing no hours spent reviewing the record). She stated that had she "not succeeded in obtaining remand," the plaintiff "would have forever lost the disability benefits." Doc. 24 at 17; *see* Doc. 16 (Commissioner's unopposed motion to remand filed before briefing); Tr. 19, 29 (finding that the plaintiff was insured through December 31, 2024, and deciding whether the plaintiff was disabled through May 3, 2023). She stated that the plaintiff received more than "seven years" of past-due benefits. Doc. 24 at 17; *see* Doc. 24-1 (agency letter describing a five-year period of past-due benefits). She stated that "[t]he case was ultimately won in large part due to counsel's efforts and the Memorandum of Law filed with the Court." Doc. 24 at 17–18; *see* docket (showing that Avard never filed a memorandum of law). She stated that $34,361.00 is less than 25 percent of the past-due benefits. Doc. 24 at 6; (25 percent of $137,444.00 is $34,361.00, not less than $34,361.00). She stated that she "had the burden of proving disability prior to a remote onset date going back to April 2020." Doc. 24 at 13; *see* Tr. 19 (describing November 1, 2019, as the alleged onset date). And she stated that

---

and adapting or managing oneself. Tr. 20, 22. Considering the decision on the current motion, whether the plaintiff understood the agreement need not be addressed.

6

the plaintiff had retained her in August 2021. Doc. 24 at 4; *see* Tr. 87 (first retainer agreement signed in July 2021).

### F.

Avard filed the same motion, with the same material factual misrepresentations, twice. She first filed the motion during a government shutdown, when she could not confer with counsel for the Commissioner to obtain his position on the motion, as required by Local Rule 3.01(g). *See* Doc. 24. The court denied the motion without prejudice to renewing the motion after the appropriation of funds and the required conferral. Doc. 25. After those events occurred, Avard filed the same motion again, modifying the Local Rule 3.01(g) certificate to represent that she had conferred with opposing counsel. *Compare* Docs. 24, 24-1 to 24-5, *with* Docs. 26, 26-1 to 26-5.

Avard signed—or purported to sign—both motions with a typed signature (i.e., "s/Carol Avard"). Doc. 24 at 23; Doc. 26 at 23.

### G.

The Commissioner responded to the renewed motion by stating that Avard is the real party-in-interest, that the Commissioner has no financial stake in the outcome of the motion, that the Commissioner "plays a part in the fee determination resembling that of a trustee for the claimants[,]" and that the Commissioner therefore neither supports nor opposes the motion. Doc. 27 at 1–2 (quoting *Gisbrecht v. Barnhart*, 535 U.S. 789, 798 n.6 (2002)). The Commissioner asked the court to specify that the payment of the authorized fee amount is from the plaintiff's past-due benefits "*in accordance with agency policy*" and to order Avard to reimburse the EAJA fee that she had obtained.

Doc. 27 at 2–3. Although purporting to be akin to a trustee for the plaintiff, the Commissioner said nothing about Avard's material factual misrepresentations offered to support taking $34,361.00 from the plaintiff's past-due benefits. *See* Doc. 27.

## H.

In 2024 and 2025, 17,234 Social Security cases were commenced in federal district courts. *See U.S. District Courts—Civil Cases Commenced, by Basis of Jurisdiction and Nature of Suit, During the 12-Month Periods Ending December 31, 2024 and 2025*, U.S. Courts, https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.usc ourts.gov%2Fsites%2Fdefault%2Ffiles%2Fdocument%2Fstfj_c2_1231.2025.xl sx&wdOrigin=BROWSELINK (last visited June 12, 2026). Of those commenced in 2025, 503 were filed in the Middle District of Florida, the highest number among the nine district courts in the Eleventh Circuit and the seventh-highest among the 94 district courts in the country. *See U.S. District Courts—Civil Cases Commenced, by Nature of Suit and District, During the 12-Month Period Ending December 31, 2025*, U.S. Courts, https://view.officeapps.live.com/op/view.aspx?src=https%3A%2F%2Fwww.usc ourts.gov%2Fsites%2Fdefault%2Ffiles%2Fdocument%2Fstfj_c3_1231.2025.xl sx&wdOrigin=BROWSELINK (last visited June 12, 2026).

Each magistrate judge in this district assigned to Social Security cases has approximately 26 cases on the docket at any given time. In many cases, the administrative record exceeds 1,000 pages, and the plaintiff raises multiple issues in a 25-page brief, necessitating analysis in either an order or a report and recommendation. All of this is to say that the judges have many

time-consuming Social Security cases on their dockets and rely heavily on the competence and correctness of the lawyers who bring and defend the claims.

## I.

The court denied Avard's renewed § 406(b) motion without prejudice to again renewing it and ordered her to show cause why sanctions should not be imposed for her factual misrepresentations to the court. Doc. 28. Avard responds to the order to show cause in two ways.

First, Avard observes that this case involved the rare instance of the Commissioner moving for remand before any brief was filed and explains that she had instructed a paralegal to use a template from another case, that she "has a policy of circulating court filings among attorneys at the firm for comment," and that "an incorrect and unfinished version of the draft was accidentally filed with the Court before the draft circulated among in-house attorneys." Doc. 30 at 2. She argues that aspects of the motion—for example, the correct number of hours in an exhibit and the correct timeframe for past-due benefits in some places in the motion—demonstrate that she had not acted in bad faith. Doc. 30 at 2–3. She says nothing about the fact that she filed the same motion on two separate occasions, the second time changing the Local Rule 3.01(g) certificate; the fact that the motion appears complete insofar as no section or sentence is missing; or that her signature is on both motions. *See* Doc. 30.

Second, Avard now says that she "believes that asking for the full 25 percent of fees in circumstances where no brief was filed is unreasonable based on the factors outlined in *Gisbrecht*" and will file an amended motion "requesting what she believes [is] a reasonable amount in conjunction with the

present response and leaving it to the Court to award what it deems reasonable and just." Doc. 30 at 3.

## J.

A second renewed motion followed. *See* Doc. 31. Avard now requests authorization to take $16,493.28 (she confusingly requests $16,361.00 in one place in her motion, *see* Doc. 31 at 4) from the plaintiff's benefits as an attorney's fee for the 2 hours she recorded for the pre-lawsuit consulting and file review, and the .9 hours she recorded for reviewing docket entries. Doc. 31. She acknowledges that she must refund the $1,270.20 EAJA attorney's fee to the plaintiff. Doc. 31 at 2, 7.

Avard contends that the fee request—12 percent of the past-due benefits—is reasonable because the court found a similar percentage reasonable in two other cases in which counsel filed no brief. Doc. 31 at 12 (citing *Grey v. Bisignano*, No. 8:21-cv-596-CEH-TGW (M.D. Fla.), and *Smith v. Acting Comm'r of Soc. Sec.*, No. 3:22-cv-1367-PDB (M.D. Fla.)). Relying on decades-old statistics to suggest that claimants who sue prevail only about 33.5 percent of the time, she contends that the fee request is reasonable because it "reflects the contingent nature of the recovery." Doc. 31 at 13–14 (citing statistics from May 2006 on reversals since 1995); *see Fiscal Year 2025 Workload Data: Disability Decisions*, Soc. Sec. Admin. (Jan. 8, 2026), https://www.ssa.gov/foia/resources/proactivedisclosure/2026/FY25%20Worklo ad%20Data.pdf (statistics not mentioned by Avard showing a 65-percent remand rate for fiscal year 2025).[7] She contends that the fee request is

---

[7]Avard provides the more recent statistics on her law firm's website. *See* https://avardlaw.com/social-security-disability/2025-social-security-disability-approval-rates-why-representation-matters-more-than-ever/ (last visited June 12, 2026)

reasonable because the plaintiff "recouped" $137,444.00 in benefits and will continue to receive benefits, including Medicare benefits, until he dies, reaches retirement age, or is no longer disabled. Doc. 31 at 15. She contends that the fee request is reasonable because the $1,270.20 EAJA fee will offset the amount taken from the plaintiff's benefits. Doc. 31 at 19. And she contends that the fee request is reasonable because of "the years of representation without payment or interest." Doc. 31 at 19.

The Commissioner files substantially the same response, but this time couches its assertedly neutral position in terms of an effective hourly rate, stating, "It is for the Court to decide if the request for $5,687.34 per hour in attorney's fees for services provided before the court under … § 406(b) is reasonable under the law." Doc. 32 at 2.

## K.

Sections 406(a) and 406(b) govern fees for Social Security claimants. Subsection (a) addresses a fee for representation before the agency; subsection (b) addresses a fee for representation before the court. *Culbertson v. Berryhill*, 586 U.S. 53, 59 (2019). "Because some claimants will prevail before the agency and have no need to bring a court action, it is unsurprising that the statute contemplates separate fees for each stage of representation." *Id*. The "subsections also calculate fees differently." *Id*.

---

(displaying the 2025 statistics in a graph, but incorrectly explaining the Appeals Council review data as federal court decisions data and vice versa).

**L.**

For the representation of a claimant before the agency, a lawyer may file either a fee petition or a contingent-fee agreement. *See* 42 U.S.C. § 406(a). When a lawyer files a petition, the agency may allow fees "for services performed in connection with any claim before" it. *Id.* § 406(a)(1). If the claimant obtained a favorable determination, the Commissioner "shall ... fix ... a reasonable fee" for the lawyer's services. *Id.* To determine the amount of fees, the agency considers the purpose of the Social Security program (i.e., "to provide a measure of economic security for the beneficiaries of the program") and seven factors: (1) "[t]he extent and type of services the representative performed"; (2) "[t]he complexity of the case"; (3) "[t]he level of skill and competence required of the representative in giving the services"; (4) "[t]he amount of time the representative spent on the case"; (5) "[t]he results the representative achieved"; (6) "[t]he level of review to which the claim was taken and the level of the review at which the representative became [the claimant's] representative"; and (7) "[t]he amount of fee the representative requests for his or her services, including any amount authorized or requested before, but not including the amount of any expenses he or she incurred." 20 C.F.R. § 404.1725(b)(1). Although the agency considers the amount of benefits, if any, the agency does not base the fee on that amount alone because "[t]he benefits payable in any claim are determined by specific provisions of law and are unrelated to the efforts of the representative." *Id.* § 404.1725(b)(2). The agency "may authorize a fee even if no benefits are payable." *Id.*

Alternatively, a lawyer may file a contingent-fee agreement before the agency issues its determination. 42 U.S.C. § 406(a)(2)–(4). If the determination favors the claimant, the Commissioner "shall approve" the agreement, subject

12

to the limitation that the fee may not exceed the lesser of 25 percent of the past-due benefits or $4,000.00 (increased to $9,200.00 effective May 6, 2025). *Id.* § 406(a)(2)(A)(ii), (iii); *see* 90 Fed. Reg. 19241, 19242 (May 6, 2025); *see also* Tr. 87 (contingent-fee agreement Avard filed with the agency).

## M.

For the representation of a claimant before a court, Congress allows fees if the court enters judgment for the claimant:

> Whenever a court renders a judgment favorable to a claimant … who was represented before the court by an attorney, the court may determine and allow as part of its judgment a reasonable fee for such representation, not in excess of 25 percent of the total of the past-due benefits to which the claimant is entitled by reason of such judgment, and the Commissioner … may … certify the amount of such fee for payment to such attorney out of, and not in addition to, the amount of such past-due benefits.

42 U.S.C. § 406(b)(1)(A). "In case of any such judgment, no other fee may be payable or certified for payment for such representation[.]" *Id.*

## N.

Under the EAJA, a party prevailing against the United States in court may be awarded an attorney's fee from the United States unless the United States' position was "substantially justified." 28 U.S.C. § 2412(d)(1)(A). The EAJA's purpose is "to eliminate for the average person the financial disincentive to challenge unreasonable governmental actions." *Comm'r, I.N.S. v. Jean*, 496 U.S. 154, 163 (1990).

In the Social Security context, the EAJA "effectively increases the portion of past-due benefits the successful Social Security claimant may

pocket." *Gisbrecht*, 535 U.S. at 796. An EAJA fee is determined by the lawyer's time expended and hourly rate, 28 U.S.C. § 2412(d)(1)(B), and is capped at $125.00 an hour, *id.* § 2412(d)(2)(A), an amount that may be increased based on the cost of living or another special factor, *id. See Meyer v. Sullivan*, 958 F.2d 1029, 1033–34 (11th Cir. 1992) (describing the process for determining an EAJA fee).

A fee award may be made under both the EAJA and § 406(b), but the claimant's lawyer must refund the claimant the amount of the smaller fee. *Gisbrecht*, 535 U.S. at 796; *accord Jackson v. Comm'r of Soc. Sec.*, 601 F.3d 1268, 1273–74 (11th Cir. 2010) (explaining the options for effectuating the refund). Accordingly, the past-due benefits a claimant actually receives will be increased by the EAJA award. *Gisbrecht*, 535 U.S. at 796.

## O.

In *Gisbrecht*, the Supreme Court interpreted § 406(b), asking whether a contingent-fee agreement between a claimant and a lawyer, if not greater than 25 percent of past-due benefits, is presumptively reasonable or whether a court should begin determining a reasonable attorney's fee with a lodestar calculation. 535 U.S. 792. The Court acknowledged that contingent fees are "problematic," especially "when not exposed to court review," and that Congress enacted § 406(b) to address lawyers sometimes charging inordinately large fees for representing Social Security claimants. *Id.* at 803–04. Concluding that "Congress … designed § 406(b) to control, not to displace, fee agreements between Social Security benefits claimants and their counsel," the Court reversed and remanded for the recalculation of fees payable from the claimants' past-due benefits because the lower court's "decision … rest[ed] on lodestar calculations and reject[ed] the primacy of lawful attorney-client fee

14

agreements[.]" *Id.* at 793; *accord Gossett v. Soc. Sec. Admin., Comm'r*, 812 F. App'x 847, 850–51 (11th Cir. 2020) (reversing a § 406(b) fee decision because the district court relied solely on the lodestar calculation).

The Court made the following statements about a court's review of a § 406(b) motion. Section "406(b) calls for court review of such arrangements as an independent check, to assure that they yield reasonable results in particular cases." *Gisbrecht*, 535 U.S. at 807; *see also id.* at 808 ("Although the contingency agreement should be given significant weight in fixing a fee, a district judge must independently assess the reasonableness of its terms.") (quoting *McGuire v. Sullivan*, 873 F.2d 974, 983 (7th Cir. 1989)). "Congress has provided one boundary line: Agreements are unenforceable to the extent that they provide for fees exceeding 25 percent of the past-due benefits." *Id.* at 807. "Within the 25 percent boundary, … the attorney for the successful claimant <u>must show</u> that the fee sought is reasonable for the services rendered." *Id.* (emphasis added). "Courts that approach fee determinations by looking first to the contingent-fee agreement, then testing it for reasonableness, have appropriately reduced the attorney's recovery based on the character of the representation and the results the representative achieved." *Id.* at 808 (citing with approval *Lewis v. Sec'y of Health & Hum. Servs.*, 707 F.2d 246, 249–50 (6th Cir. 1983), which held that substandard representation warrants a reduced fee).

The Court gave two examples of instances when a reduction of the fee is warranted: if the lawyer is responsible for delay, to avoid the lawyer profiting from the accumulation of benefits during the court proceedings; and if the benefits are large compared to the time the lawyer spent on the case, to avoid the lawyer receiving a windfall. *Id.* at 808 (citing with approval *Rodriquez v.*

*Bowen*, 865 F.2d 739, 746–47 (6th Cir. 1989)); *accord Walker v. Comm'r, Soc. Sec. Admin.*, 844 F. App'x 104, 108 (11th Cir. 2021) ("*Gisbrecht* explicitly provides that a windfall to the attorney is an independent reason for a district court to find a fee agreement unreasonable. Thus, the … determination that the requested amounts represented a windfall for the number of hours [counsel] worked on each case was a reasonableness determination under *Gisbrecht*, not an improper lodestar analysis." (internal citation omitted)). The Court provided this explanation:

> In this regard, the court may require the claimant's attorney to submit, not as a basis for satellite litigation, but as an aid to the court's assessment of the reasonableness of the fee yielded by the fee agreement, a record of the hours spent representing the claimant and a statement of the lawyer's normal hourly billing charge for noncontingent-fee cases.

*Gisbrecht*, 535 U.S. at 808. The Court emphasized the discretion that judges have in determining the reasonableness of an attorney's fee: "Judges of our district courts are accustomed to making reasonableness determinations in a wide variety of contexts, and their assessments in such matters, in the event of an appeal, ordinarily qualify for highly respectful review." *Id*. The Court concluded:

> The courts below erroneously read § 406(b) to override customary attorney-client contingent-fee agreements. We hold that § 406(b) does not displace contingent-fee agreements within the statutory ceiling; instead, § 406(b) instructs courts to review for reasonableness fees yielded by those agreements.

*Id.* at 808–09.

16

**P.**

Justice Scalia dissented, saying, "I do not know what the judges … are to make of today's opinion. I have no idea what the trial judge is to do if he finds the fee produced by the ('presumptively reasonable') contingent-fee agreement to be 25% above the lodestar amount; or 40%; or 65%." 535 U.S. at 809 (Scalia, J., dissenting) (internal citation omitted). He complained that the decision combines "the incompatible":

> The Court tells the judge to commence his analysis with the contingent-fee agreement, but then to adjust the figure that agreement produces on the basis of factors (most notably, the actual time spent multiplied by a reasonable hourly rate) that are, in a sense, the precise antithesis of the contingent-fee agreement, since it was the very *purpose* of that agreement to eliminate them from the fee calculation. ….
>
> I think it obvious that the reasonableness of a contingent-fee arrangement *has to be* determined by viewing the matter *ex ante,* before the outcome of the lawsuit and the hours of work expended on the outcome are definitively known. For it is in the nature of a contingent-fee agreement to *gamble* on outcome and hours of work— assigning the risk of an unsuccessful outcome to the attorney, in exchange for a percentage of the recovery from a successful outcome that will (because of the risk of loss the attorney has borne) be higher, and perhaps much higher, than what the attorney would receive in hourly billing for the same case. That is why, in days when obtaining justice in the law courts was thought to be less of a sporting enterprise, contingent fees were unlawful.
>
> It is one thing to say that a contingent-fee arrangement is, *ex ante,* unreasonable because it gives the attorney a percentage of the recovery so high that no self-respecting legal system can tolerate it; the statute itself has made this determination for Social–Security–benefit cases, prescribing a maximum contingent fee of 25%. And one can also say that a contingent-fee arrangement is, *ex ante,* unreasonable because the chances of success in the particular case are so high, and the anticipated legal work so negligible, that the percentage of the recovery assured to the lawyer is exorbitant[.] … It is something quite different, however—and something quite

17

irrational—to look at the *consequences* of a contingent-fee agreement *after the contingencies have been resolved,* and proclaim those consequences unreasonable because the attorney has received too much money for too little work. That is rather like declaring the purchase of the winning lottery ticket void because of the gross disparity between the $2 ticket price and the million-dollar payout.

*Id.* at 810–11 (Scalia, J., dissenting) (internal citations omitted).

As Justice Scalia predicted, "courts have struggled significantly in applying *Gisbrecht.*" *Jeter v. Astrue,* 622 F.3d 371, 376 (5th Cir. 2010) (quoted authority omitted).

## Q.

The Second Circuit has applied *Gisbrecht* in the following manner. The most pertinent factors for determining a § 406(b) fee based on a contingent-fee agreement are the character of the representation and the results the representative achieved, whether the lawyer is responsible for an undue delay, whether there was fraud or overreaching in the making of the agreement, and whether the benefits are large compared to the lawyer's time spent on the case such that the contingent fee would constitute a "windfall" to the lawyer.[8] *Fields v. Kijakazi,* 24 F.4th 845, 853 (2d Cir. 2022).

According to the Second Circuit, all but the windfall factor "are straightforward and readily applied." *Id.* "[T]he windfall factor does *not* constitute a way of reintroducing the lodestar method[.]" *Id.* at 854. In deciding

---

[8]Outside § 406(b), in the fee-shifting, lodestar context, the Supreme Court has criticized the use of factors that courts had used to apply to determine a reasonable fee because they "gave very little actual guidance to district courts" and "[s]etting attorney's fees by reference to a series of sometimes subjective factors placed unlimited discretion in trial judges and produced disparate results." *Perdue v. Kenny A. ex rel. Winn,* 559 U.S. 542, 550–51 (2010).

18

whether there is a windfall that makes a fee unreasonable, a court must consider more than the effective hourly rate because "even a relatively high hourly rate may be perfectly reasonable, and not a windfall, in the context of any given case." *Id.* Instead, a court must consider "the ability and expertise of the lawyers" and whether the lawyers "were particularly efficient, accomplishing in a relatively short amount of time what less specialized or less well-trained lawyers might take far longer to do." *Id.* A court also must consider "the nature and length of the professional relationship with the claimant—including any representation at the agency level"—which "can inform a district court's understanding of 'the overall complexity of the case, the lawyering skills necessary to handle it effectively, the risks involved, and the significance of the result achieved in district court.'" *Id.* at 855 (quoting *Mudd v. Barnhart*, 418 F.3d 424, 428 (4th Cir. 2005)). A court also must consider the client's satisfaction. *Id.* And a court must consider "how uncertain it was that the case would result in an award of benefits and the effort it took to achieve that result." *Id.* "A windfall is more likely to be present in a case … where the lawyer takes on a contingency-fee representation that succeeds immediately and with minimal effort, suggesting very little risk of nonrecovery." *Id.* at 856. "That kind of unearned advantage is what the windfall concern really is about." *Id.*

## R.

The Fifth Circuit has applied *Gisbrecht* in the following manner. *Gisbrecht*'s "prohibition against lone reliance on the lodestar method still permits a court to include a lodestar calculation in its consideration of the fee— specifically, in instances where the court simultaneously relies on additional factors to support its determination that the contingency fee constitutes an

unearned advantage to the attorney—such that the fee award may be considered a windfall." *Jeter*, 622 F.3d at 377. The Fifth Circuit provided this elaboration:

> In other words, the *Gisbrecht* Court's reference to windfall leaves room for consideration of an effective hourly fee rate, but only so long as this mathematical calculation is accompanied by consideration of whether an attorney's success is attributable to his own work or instead to some unearned advantage for which it would not be reasonable to compensate him.
>
> Any other reading would give attorneys a perverse incentive to delay proceedings or expend unnecessary hours in an effort to prolong successful litigation—all to ensure that their § 406(b) fee would not be reduced based on its appearing excessively high in comparison to the number of hours they expended.

*Id.* at 380. "*Gisbrecht*'s prohibition on the lodestar method [i]s an affirmation that if a claimant's success on appeal can be attributed to his attorney's endeavors before the district court, then that attorney should reap the benefit of his work—even if he managed to accomplish a great deal in a small window of time." *Id.* at 381. The Fifth Circuit explained, "In this way, *Gisbrecht*'s 'windfall' does not preclude attorneys from recovering what may mathematically seem like a high fee award if the attorney's success on appeal is of his own making." *Id.*

The Fifth Circuit does not "prescribe an exhaustive list of the precise factors … lower courts must consider in order to determine whether a particular fee is unearned such that it may be considered a windfall" because "district courts are in a better position to determine what factors are relevant in considering whether the success of a claimant's claim before their court can be attributed to the attorney's work—or whether the success is unearned on the part of the attorney[.]" *Id.* But the Fifth Circuit identified factors that

20

district courts have considered: the risk of loss in the representation, the lawyer's experience, the percentage of the past-due benefits the fee constitutes, the value of the case to the claimant, the degree of difficulty, and whether the client consents to the requested fee. *Id.* at 382. According to the Fifth Circuit, "*Gisbrecht* … certainly did not expect our district judges to turn a blind eye to hourly fee rates that are excessively high for the services provided in their courts." *Id.* "Rather, … *Gisbrecht* … made it clear that as a result of the legislative history behind § 406(b)—as well as the difficult nature of Social Security appeals and their low rates of success in general—an excessively high hourly rate alone does not render an otherwise reasonable fee unreasonable." *Id.*

### S.

The Sixth Circuit continues to adhere to its precedent in *Rodriquez*, cited favorably in *Gisbrecht*, under which a contingent-fee agreement within the 25 percent cap is not per se reasonable but is entitled to a rebuttable presumption of reasonableness. *Tucker v. Comm'r of Soc. Sec.*, 136 F.4th 639, 643 (6th Cir. 2025) (citing *Gisbrecht*, 535 U.S. at 808). The agreement is the "starting point" of the analysis; the court must give the agreement "close attention" and "due deference"; and, if the court does not give effect to the agreement's terms, the court must explain why. *Id.* (quoted authority omitted).

Deductions usually fall into two categories: those based on improper conduct or the lawyer's ineffectiveness, and those warranted because the lawyer would otherwise enjoy a windfall occasioned by an "inordinately large benefit award" or "minimal effort expended." *Id.* (quoted authority omitted). A court may consider rates and hours, and even make that consideration the primary one, but may not reduce the fee solely on the basis of effective hourly

21

rates, given that a contingent arrangement "overcompensate[s] in some cases and undercompensate[s] in others." *Id.* at 643–44 (quoted authority omitted). "This approach recognizes that Congress has put the responsibility on the federal judiciary to make sure that fees charged are reasonable and do not unduly erode the claimant's benefits." *Id.* at 644 (internal quotation marks and quoted authority omitted).

The Sixth Circuit set a "floor" for the analysis. *Id.* An effective hourly rate is per se reasonable if it is less than twice the standard rate for the same type of work in the relevant market. *Id.* A court may consider arguments rebutting the presumption if the effective hourly rate is equal to or greater than twice the standard rate for the same type of work in the relevant market. *Id.*

### T.

The Seventh Circuit has applied *Gisbrecht* in the following manner. "[A] district court must begin with the contingency award as its polestar and consider whether that amount should be reduced because it is unwarranted based on relevant factors." *Arnold v. O'Malley*, 106 F.4th 595, 601 (7th Cir. 2024). Non-exhaustive factors include "the claimant's satisfaction with their attorney's representation, the attorney's expertise and efforts expended, whether the attorney engaged in any undue delay or overreaching, the uncertainty of recovery and risks of an adverse outcome, and how the effective hourly rate compares to others in the field and jurisdiction." *Id.* The Seventh Circuit explained, "This approach adheres to the dictate in *Gisbrecht* that courts should give primacy to fee agreements, while still leaving room for district courts to act as a 'check' on contingent-fee arrangements that result in unreasonable fees, including when 'benefits are large in comparison to the

22

amount of time counsel spent on the case.'" *Id.* at 601–02 (quoting *Gisbrecht*, 535 U.S. at 807–08).

**U.**

The Eighth Circuit has applied *Gisbrecht* in the following manner. The award set by the contingent-fee agreement must be the "anchor" of the court's reasonableness analysis. *Kertz v. Colvin*, 125 F.4th 1218, 1221 (8th Cir. 2025) (quoting *Arnold*, 106 F.4th at 601). A court may consider the lodestar in the analysis as long as the court can articulate why the fee would result in an "unearned advantage." *Id.* (quoting *Jeter*, 622 F.3d at 380). "[T]he windfall factor may not reintroduce the lodestar as the primary consideration[.]" *Id.* Rather, in accord with "the Supreme Court's express guidance in *Gisbrecht* as reflected in *Rodriquez*":

> We will not incorporate a scale or grid … or otherwise attempt to draw a line beyond which a fee becomes unconscionable.
>
> ….
>
> Where a case has been submitted on boilerplate pleadings, in which no issues of material fact are present and where no legal research is apparent, the benchmark twenty-five percent of awards fee would obviously be inappropriate. The reviewing courts should not hesitate to make reductions in such situations, and at the other end of the spectrum should only allow maximum fees for extensive effort on the part of counsel who have overcome legal and factual obstacles to the enhancement of the benefits awarded to his client.

*Kertz*, 125 F.4th at 1221 (quoting *Rodriquez*, 865 F.2d at 747). Legitimate reasons for reducing the fee include delay during the agency proceedings, which resulted in much higher past-due benefits; the fact that, because the case was remanded on the parties' motion, a federal judge never substantively reviewed the case and the lawyer was never actively involved in litigation,

23

which speaks to the character of the representation; and the fact that the lawyer spent only a few dozen hours on the case. *Id.* at 1222–23.

## V.

From *Gisbrecht* and the cases interpreting *Gisbrecht*, the following approach may be gleaned. The court's first consideration is the contingent-fee agreement. If the court finds that a reduction of the resulting contingent fee is warranted, the court must articulate its reasoning. That reasoning cannot rest solely on the lodestar (the prevailing market rate multiplied by the number of work hours) or the effective hourly rate (the contingent fee divided by the number of work hours). Other considerations may include the character of the representation as substandard or otherwise; the results the lawyer achieved and the significance of those results; whether the lawyer is responsible for delay resulting in the accumulation of benefits; the lawyer's normal hourly billing charge for noncontingent-fee cases; how the effective hourly rate compares to others in the field and jurisdiction; whether there was fraud or overreach in making the agreement or otherwise; whether the benefits are large compared to the time spent on the case, resulting in a windfall; the lawyer's ability and expertise; the lawyer's effort and whether the lawyer was particularly efficient; the nature and length of the professional relationship with the client; the overall complexity of the case, the degree of difficulty of the issues, and the lawyering skills necessary to handle the case effectively; the client's satisfaction; whether the success is attributable to the lawyer; the percentage of the past-due benefits the fee constitutes; the value of the case to the client; whether the client consents; and the uncertainty of recovery and the risks of an adverse outcome.

24

## W.

In the fee-shifting context, the Eleventh Circuit has held that a court must hold the movant to its burden and must not absolve the movant of its burden by, for example, reducing requested hours based on an arbitrarily selected percentage. *Johnston v. Borders*, 36 F.4th 1254, 1286–87 (11th Cir. 2022).

## X.

The court now returns to this case and Avard's current request for authorization to take $16,493.28 from the plaintiff's past-due benefits as an attorney's fee for the 2 hours she recorded for pre-lawsuit consulting and reviewing the familiar file (both on the heels of her representation of the plaintiff before the agency), and the .9 hours she recorded for reviewing docket entries, with acknowledgment that she must refund the $1,270.20 EAJA fee to the plaintiff. Doc. 31; *see* § J, *supra*.

To decide the motion, the court begins with an emphasis on the following facts. Avard and the plaintiff entered into a contingency agreement under which the plaintiff agreed that Avard may charge "25% of retroactive benefits" for the work she performed before the court, subject to court approval. Docs. 24-2, 31-2; *see* § E, *supra*. Avard accepted the representation of the plaintiff without knowing whether she would be paid a fee for her work before the court. The contingent fee under the agreement is $34,361.00. Avard must refund the $1,270.20 EAJA fee to the plaintiff, resulting in a lesser amount taken from his past-due benefits. *See Gisbrecht*, 535 U.S. at 796. With those facts, including the "polestar," in mind, *see Arnold*, 106 F.4th at 601 (quoted), the

court turns to four reasons why Avard fails to satisfy her burden of showing that the fee she ultimately requests—$16,493.28—is reasonable.

First, Avard did little to no substantive work in this case in this court. *See* § C, *supra*. It bears repeating that, before the form complaint was filed, Avard recorded 2 hours to consult with the plaintiff and review the file (something with which she was familiar, having served as the plaintiff's counsel before the agency) and, after the filing of the form complaint (something she did not claim as work in this case) and before judgment was entered for the plaintiff, she did nothing more than review docket entries comprising docket text, brief orders, and a few other rudimentary papers. *See* § C, *supra*; footnotes 2–4, *supra*. She possesses exceptional experience in the Social Security area, *see* Doc. 31 at 16–18; § B, *supra*, and may have used that experience to decide that this was a case worth keeping from agency to court, *see* footnote 1, *supra*. But, in this case, before this court, she had no occasion to display that knowledge. *See* § C, *supra*. The work that she recorded, which shows no time spent negotiating the outcome, indicates that the Commissioner's work, not hers, prompted the motion to remand. *See Fields*, 24 F.4th at 856 ("A windfall is more likely to be present in a case … where the lawyer takes on a contingency-fee representation that succeeds immediately and with minimal effort, suggesting very little risk of nonrecovery. That kind of unearned advantage is what the windfall concern really is about."); *Kertz*, 125 F.4th at 1222 (approving as a legitimate basis for a downward adjustment the district court's consideration of the facts that, because the case was remanded on the parties' motion, the lawyer was never actively involved in litigation beyond filing an opening brief and a federal judge never substantively reviewed the case).

26

Second, the effective hourly rate for the time claimed (2.9 hours)—including the pre-lawsuit work (2 hours)—is $5,687.34, which is nearly 25 times the EAJA hourly rate ($244.27), and nearly 15 times the hourly rate charged in Jacksonville by lawyers of reasonably comparable skill, experience, and reputation for similar services (i.e., mostly reviewing docket entries; generously, based on the court's own experience, $400.00). By either measure, the effective hourly rate is inordinately high.

Third, Avard provides no information about the plaintiff's satisfaction with her representation in this court, and the court is unwilling to assume satisfaction based merely on the agency's ultimate award of $137,444.00 in past-due benefits after a remand that occurred without any briefing whatsoever by Avard in this court or, apparently, without any negotiation by her behind the scenes. If the plaintiff was told the circumstances (Avard did no substantive work and wants $16,493.28 for the 2 hours of pre-lawsuit consultation and review of a familiar file and a review of minimal court filings, on top of the $9,200.00 she and someone else from her firm received for their work before the agency, *see* § D, *supra*), the plaintiff might very well respond that the request seems unconscionable, and while he was pleased with Avard's work before the agency, he is confused about why what she did before the court would warrant taking $16,493.28 (minus the $1,270.20 EAJA fee) from his benefits. The court is left with neither adversarial briefing nor the position of the only other person, besides Avard, affected by the outcome.

And fourth—though the other three reasons suffice—Avard, at best, was sloppy, unprofessional, and overly relied on forms—all the possible product of factory-like processes that resulted in the filing of a form motion—*twice*—with her signature and with material factual misrepresentations but without her or

27

any other lawyer's review. *See* Docs. 24, 26. Besides that, she continues to use cut-and-paste language that clearly has no application in this case: "The case was ultimately won in large part due to counsel's efforts," Doc. 31 at 18; and "the large EAJA offset," Doc. 31 at 20. She continues to get numbers wrong. *See* Doc. 31 (requesting $16,361.00 in one place and $16,493.28 in others). She continues to reference "attorneys" in the plural despite the fact that only she claims to have performed legal work on the case in this court. *See* Doc. 31 at 2, 12, 18, 20. She continues to get the onset date wrong and otherwise confusingly asserts that she had a burden of proving disability "prior to" the onset date. *Compare* Tr. 19 (November 2019 alleged onset date), *with* Doc. 31 at 13 (April 2020). She continues to assert that she faced a "substantial risk" of nonpayment, but she fails to connect that assertion to the circumstances of this case. *See* Doc. 31 at 14; footnote 1, *supra*. She continues to state that she spent "years of representation without payment or interest," without acknowledging that she has already been paid the § 406(a) fee allowed for her representation of the plaintiff during the agency proceedings and the EAJA fee for her representation of the plaintiff during the court proceedings. *See* Docs. 22, 23 (EAJA fee awarded in 2023 for the only work she did before this court, all of which was in the same year). She continues to rely on outdated statistics (1996 to 2005), Doc. 31 at 13–14, for the bold propositions, "Therefore, claimants who go to district court ultimately prevail about 33.50% (5% + (45% x 67%)) of the time," and, "Other things being equal, to make up for the risk of loss, an attorney would need to charge a winning client about three times the fee the attorney would have charged a client paying on a non-contingent basis," without citing current statistics showing the more current 65-percent remand rate, *see* § J, *supra*.

28

The reasons that Avard provides for purporting to satisfy her burden of showing reasonableness are unpersuasive. The two cases that she cites in which the court allowed a § 406(b) fee at a percentage similar to what she requests are non-binding and involve different circumstances. In neither did counsel twice file a motion with material factual misrepresentations; in neither did counsel overreach by first requesting the full 25 percent of past-due benefits for little to no substantive legal work, withdrawing and reducing the request only after being questioned by the court; in neither did counsel make the other mistakes described; and, at least in *Grey*, counsel recorded substantive legal work (preliminary research and reviewing the administrative transcript). *See Grey*, No. 8:21-cv-596-CEH-TGW (M.D. Fla.); *Smith*, No. 3:22-cv-1367-PDB (M.D. Fla.). Avard's statistics-based argument is premised on data too old to matter. The EAJA offset is too small to make a substantial difference. That the plaintiff received past-due benefits, including Medicare, and will continue to receive benefits until he dies, reaches retirement age, or is no longer disabled, has little to nothing to do with the work that Avard did in this court. And Avard's contention that "the years of representation without payment or interest" justifies the fee, *see* Doc. 31 at 19, is misleading in light of her earlier receipt of both § 406(a) and EAJA fees.

At the end of the day, even considering the primacy of the contingent-fee agreement, Avard fails to satisfy her burden of showing that a $16,493.28 attorney's fee is reasonable for the 2 hours of pre-litigation work and .9 hours of post-litigation work that she recorded. *See Gisbrecht*, 535 U.S. at 807. The court will not absolve her of her burden by reducing the amount to an arbitrarily selected number, *cf. Johnston*, 36 F.4th at 1286–87, leaving her not without any fee for her minimal work in this court, but with the $1,270.20 in EAJA fees that she has already received for that work.

**Y.**

Rule 11 is intended to deter litigation abuses. Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment; *see also Indus. Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1448 (11th Cir. 1998) ("Rule 11 is intended to reduce frivolous claims and to deter costly meritless maneuvers, thereby eliminating delay, and reducing the cost of litigation."), *overruled on other grounds by Corporación AIC, SA v. Hidroeléctrica Santa Rita S.A.*, 66 F.4th 876, 881 (11th Cir. 2023).

Rule 11(a) requires a lawyer's signature on papers, and Rule 11(b) creates a certificate by the lawyer presenting a paper to the court:

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney … certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> > (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
> >
> > (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
> >
> > (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
> >
> > (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

30

Fed. R. Civ. P. 11(b); *see also Attwood v. Singletary*, 105 F.3d 610, 613 (11th Cir. 1997) ("Rule 11 requires [litigants] to make reasonable inquiries into the veracity of information filed before the court and to advise the court of any changes.").

Rule 11(c) describes the sanctions available for a Rule 11(b) violation: "If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation." Fed. R. Civ. P. 11(c)(1). Rule 11(c) explains the requirements for a motion for sanctions under the rule and authorizes a court "[o]n its own" to "order an attorney, law firm, or party to show cause why conduct specifically described in the order has not violated Rule 11(b)." Fed. R. Civ. P. 11(c)(2)–(3). The order to show cause "provides the person with notice and an opportunity to respond." Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment.

Rule 11(c) also describes the nature of a sanction:

> A sanction imposed under this rule must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated. The sanction may include nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation.

Fed. R. Civ. P. 11(c)(4); *see also* Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment (explaining that sanctions may include "striking the offending paper; issuing an admonition, reprimand, or censure; requiring participation in seminars or other educational programs; ordering a fine payable to the court; [and] referring the matter to disciplinary authorities"); *Massengale v. Ray*, 267 F.3d 1298, 1302 (11th Cir. 2001) (explaining that a

31

Rule 11 sanction "may be imposed for the purpose of deterrence, compensation, and punishment" (quoted authority omitted)).

Rule 11(c) requires that "[a]n order imposing a sanction … describe the sanctioned conduct and explain the basis for the sanction." Fed. R. Civ. P. 11(c)(6). The rule "does not attempt to enumerate the factors a court should consider in deciding whether to impose a sanction or what sanctions would be appropriate in the circumstances; but, for emphasis, it does specifically note that a sanction may be nonmonetary as well as monetary." Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment. These considerations "may in a particular case be proper":

> Whether the improper conduct was willful, or negligent; whether it was part of a pattern of activity, or an isolated event; whether it infected the entire pleading, or only one particular count or defense; whether the person has engaged in similar conduct in other litigation; whether it was intended to injure; what effect it had on the litigation process in time or expense; whether the responsible person is trained in the law; what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case; what amount is needed to deter similar activity by other litigants[.]

*Id.* "The court has significant discretion in determining what sanctions, if any, should be imposed for a violation, subject to the principle that the sanctions should not be more severe than reasonably necessary to deter repetition of the conduct by the offending person or comparable conduct by similarly situated persons." *Id.*

A court uses an objective standard to determine whether a Rule 11 sanction is warranted. *Kaplan v. DaimlerChrysler, A.G.*, 331 F.3d 1251, 1255 (11th Cir. 2003). The standard, which is "more stringent than the original good-faith formula," *Aetna Ins. Co. v. Meeker*, 953 F.2d 1328, 1331 (11th Cir.

1992) (quoted authority omitted), considers what is reasonable under the circumstances and what was reasonable to believe when the paper was submitted, *Baker v. Alderman*, 158 F.3d 516, 524 (11th Cir. 1998); *see also Kaplan*, 331 F.3d at 1255 (explaining that a court must "determine whether a reasonable [party] in like circumstances could believe h[er] actions were factually and legally justified"); *Peer v. Lewis*, 606 F.3d 1306, 1311 (11th Cir. 2010) (explaining that a court "is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted" (quoted authority omitted)). The standard "does not mandate a finding of bad faith." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 47 (1991). "Rule 11 authorizes the district court to sanction a party who files a pleading containing a false factual representation if that party knew of, or did not reasonably inquire into, the falsehood." *Mitchell v. Nobles*, 873 F.3d 869, 875 (11th Cir. 2017).

A court's decision to impose a Rule 11 sanction on its own is reviewed "with particular stringency." *Kaplan*, 331 F.3d at 1255 (internal quotation marks and quoted authority omitted). The court applies a heightened standard more "akin to contempt." *Id.* at 1255–56; *see also McGregor v. Chierico*, 206 F.3d 1378, 1387 (11th Cir. 2000) (explaining that contempt must be established by clear and convincing evidence); *McDonald v. Emory Healthcare Eye Ctr.*, 391 F. App'x 851, 853 (11th Cir. 2010) (explaining that the Eleventh Circuit has "not elaborated on the 'akin to contempt' standard"); *In re Engle Cases*, 283 F. Supp. 3d 1174, 1213 (M.D. Fla. 2017) (holding that "akin to contempt" does not require subjective bad faith because contempt does not require it).

33

## Z.

Besides sanctioning a party under Rule 11, a court may sanction a party using its inherent power. *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 107 (2017); *In re Sunshine Jr. Stores, Inc.*, 456 F.3d 1291, 1304 (11th Cir. 2006); *see also* Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment ("Rule 11 is not the exclusive source for control of improper presentations of claims, defenses, or contentions. … It does not inhibit the court in punishing for contempt, in exercising its inherent powers, or in imposing sanctions, awarding expenses, or directing remedial action authorized under [the] rules[.]"). While Rule 11 "reach[es] certain … conduct, the inherent power extends to a full range of litigation abuses and must continue to exist to fill in the interstices." *Peer,* 606 F.3d at 1314 (internal quotation marks and quoted authority omitted). "Indeed, the inherent power of a court can be invoked even if procedural rules exist which sanction the same conduct, for these rules are not substitutes for the inherent power." *In re Mroz*, 65 F.3d 1567, 1575 (11th Cir. 1995) (internal citation, quotation marks, and quoted authority omitted). Still, if the bad-faith conduct is "adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power." *Chambers*, 501 U.S. at 50; *see also* Fed. R. Civ. P. 11 advisory committee's note to 1993 amendment ("*Chambers* cautions … against reliance upon inherent powers if appropriate sanctions can be imposed under provisions such as Rule 11, and the procedures specified in Rule 11—notice, opportunity to respond, and findings—should ordinarily be employed when imposing a sanction under the court's inherent powers."). A court may rely on its inherent power if "in the informed discretion of the court," Rule 11 is not "up to the task[.]" *Chambers*, 501 U.S. at 50.

"The purpose of the inherent power is both to vindicate judicial authority without resorting to contempt of court sanctions and to make the non-violating party whole." *Purchasing Power, LLC v. Bluestem Brands, Inc.*, 851 F.3d 1218, 1225 (11th Cir. 2017). "Courts considering whether to impose sanctions under their inherent power should look for disobedience and be guided by the purpose of vindicating judicial authority." *Id.*

"Because of their very potency, inherent powers must be exercised with restraint and discretion." *Chambers*, 501 U.S. at 44. To use inherent power, a court must find that a lawyer or party acted "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Id.* at 45–46 (quoted authority omitted); *accord Barnes v. Dalton*, 158 F.3d 1212, 1214 (11th Cir. 1998) ("The key to unlocking a court's inherent power is a finding of bad faith."). The standard is subjective, *Purchasing Power*, 851 F.3d at 1223–24, and "narrows the range of conduct that can satisfy this higher threshold for sanctions," *Peer,* 606 F.3d at 1314–15. Mere negligence or confusion cannot justify a finding of willfulness. *Zocaras v. Castro*, 465 F.3d 479, 483 (11th Cir. 2006).

## AA.

The court declines to sanction Avard, assuming that what occurred here will prompt a change that prevents the filing of a paper with the court containing material factual misrepresentations and Avard's signature, but no lawyer review. Avard's substantial experience stands to benefit claimants, but only if she favors concerted legal work on behalf of her clients over the blind use of forms.

35

## BB.

The second renewed motion, Doc. 31, is **denied** for failure to satisfy the burden of showing reasonableness.

**Ordered** in Jacksonville, Florida, on June 12, 2026.

*Patricia D. Barksdale*

Patricia D. Barksdale
*United States Magistrate Judge*